# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-1713, 04-1714, 04-1715, 04-1716, 04-1717, 04-1719

IN RE

COPPER ANTITRUST LITIGATION

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 02-C-0707-C, 03-C-0314-C, 03-C-0316-C,
03-C-0317-C, 03-C-0318-C, 03-C-0368-C,
MDL Docket No. 1303—**Barbara B. Crabb,** *Chief Judge.*

ARGUED NOVEMBER 1, 2004—DECIDED FEBRUARY 6, 2006

Before CUDAHY, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Although this appeal arises out of the extensive alleged conspiracy to fix prices in various copper markets that this court addressed in *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 477 (7th Cir. 2002) (*Loeb I*), the issues that concern us here would find a more comfortable home in a civil procedure class than an antitrust class. We must decide whether, on the basis of any of the theories the plaintiffs have presented to us, some or all of their claims are entitled to go forward. The district court found that the plaintiffs filed their suit too late, based on an accrual date that it thought could not be disputed. It also rejected plaintiff Southwire's argument that the earlier litigation that reached this court in *Loeb I* tolled its claims against two of the defendants long enough to make them

timely in this case. Finally, it concluded that the federal statute of limitations applicable to the plaintiffs' claims was not tolled during the pendency of certain state class actions in the California courts, which were necessarily based on state rather than federal antitrust law.

We conclude that the district court erred in its conclusion that the undisputed facts demonstrate that the plaintiffs' right to sue J.P. Morgan has to be measured from July 23, 1996. Whether viewed as a question of the time when the plaintiffs reasonably could have discovered that Morgan had anything to do with their injuries or viewed as a question of equitable estoppel and fraudulent concealment, the facts taken in the light most favorable to the plaintiffs could support a finding that their suit was timely. We find, however, that the plaintiffs' claims against Sumitomo and Global were correctly dismissed, as that set of claims does not benefit from any form of tolling. We therefore affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

# I

*Loeb I* describes the allegations about the extensive manipulations of the copper market that gave rise to these suits. We therefore limit our discussion of the facts (taken for present purposes in the light most favorable to plaintiffs) to those that are of particular relevance. See generally 306 F.3d at 474-78. Briefly, in the underlying actions that were consolidated under the multidistrict litigation (MDL) statute, 28 U.S.C. § 1407, a group of purchasers of copper rod and cathode sued J.P. Morgan Chase & Company, and Morgan Guaranty Trust Company of New York (collectively referred to as Morgan) for their participation in the copper price-fixing scandal of the 1990s, claiming that the defendants had violated the Sherman Act, 15 U.S.C. § 1, *et seq.*, and the Clayton Act, 15 U.S.C. § 15,

*et seq.* In a separate action, plaintiffs Southwire Company and Gaston Copper Recycling Corporation, a wholly owned subsidiary of Southwire (collectively referred to as Southwire), sued Sumitomo Corporation and Global Minerals & Metals Corporation (Global), claiming that the latter two companies had combined to manipulate the price of copper by artificially restricting the physical supply of copper and creating a false demand for it. These manipulations allegedly "caused the price of primary copper to rise more than 50% over a two-year period." *Loeb I,* 306 F.3d at 477. In June 1996, when Sumitomo announced that it had lost over $1.8 billion as a result of the supply restriction scheme perpetrated in large part by its employee Yasuo Hamanaka, "the trading price for copper dropped by a third almost overnight. The prices of physical copper cathode, rod, and scrap crashed comparably." *Id.*

In *Loeb I,* we upheld the district court's dismissal of a putative class that included purchasers of only copper scrap, because their injuries were indirect. 306 F.3d at 475. In the same decision, we held that the purchasers of copper rod and cathode could go forward with their antitrust claims against Morgan because they had suffered "direct and independent" injuries. *Id.* This case raises the question whether the next chapter of the litigation can proceed.

A. The Parties

The majority of plaintiffs now before us are purchasers of copper cathode and copper rod. This group includes the following companies: Asarco Inc., American Insulated Wire Corp., Essex Electric Inc., Kennecott Utah Copper Corp., Leviton Manufacturing Company, Inc., Mueller Copper Tube Company, Inc., Mueller Copper Tube Products, Inc., and Superior TeleCom, Inc. (now known as Superior Essex, Inc.). We collectively refer to this entire group of plaintiffs as the Asarco Group. Plaintiff South-

wire Company manufactures and distributes electrical quality copper rod, wire and cable.

Defendant Sumitomo is a Japanese trading corporation that allegedly engaged in various trades and transactions to fix the price of copper from September 1993 to June 1996. Global is a copper merchant that allegedly engaged in transactions with Sumitomo to restrict the physical supply of copper. Morgan provided loans to Sumitomo during the relevant time period.

### B.   The District Court Proceedings

Our decision in *Loeb I* allowing the claims of purchasers of cathode and rod to go forward gave rise to a new round of litigation. The dates when these suits were commenced are important to the central statute of limitations issue. Southwire filed its complaint against defendants Morgan, Sumitomo, and Global on December 30, 2002. On June 13, 2003, the Asarco Group filed their actions against Morgan, except for plaintiff Superior TeleCom, Inc., which filed its action on July 11, 2003. On September 4, 2003, the district court consolidated the actions with the rest of the copper antitrust litigation for pretrial purposes.

On March 3, 2004, the district court granted Morgan's motion for summary judgment against the Asarco Group and converted Morgan's motion to dismiss against Southwire into a motion for summary judgment. The court granted these motions, finding that all of the plaintiffs' claims against Morgan were filed after the expiration of the applicable four-year limitations period. See 15 U.S.C. § 15b. It came to the same conclusion for Southwire's claims against Sumitomo and Global.

The first issue that the court addressed was when the plaintiffs' claims accrued. In one order, it confirmed that Southwire's claims against Sumitomo and Global accrued on June 14, 1996, as Southwire had admitted in its com-

plaint. In another order, it selected the date July 23, 1996, as the point when all claims against Morgan had accrued, placing conclusive weight on the fact that by this time, the general press had reported that Sumitomo had financed its transactions through Morgan. For example, an article published in *The New York Times* on June 17, 1996, reported that the Commodity Futures Trading Commission was investigating ties between Sumitomo and Global. This article also reported that Morgan and Bankers Trust had taken "an active part" in the hedging transactions of the copper market. The court also referenced an Associated Press release dated July 23, 1996, stating that "[l]oan agreements between Sumitomo and Chase Manhattan Corp. and J.P. Morgan & Co. are under scrutiny because they may have played a role in [Yasuo] Hamanaka's attempt to buy large supplies of copper and artificially boost copper prices." Finally, the court relied on a *Wall Street Journal* article published the same day discussing loans that were made in the form of derivative contracts from Chase to Sumitomo in the amount of $500 million and from Morgan to Sumitomo in the amount of $400 million. The article described the loans as being "unusually structured." Based on these reports and articles that appeared later in 1996 and 1997, the district court reasoned that:

> [p]laintiffs do not argue that as of July 23, 1996, they did not know that they had been injured or that Sumitomo was potentially responsible for the injuries. They argue only that despite the newspaper reports, they did not know and could not have known as of this date that the J.P. Morgan defendants had played a part in producing their injuries. They are correct, but the point is not whether they would have *known* that defendants played a part; it is whether they knew enough to suspect a violation that they could have detected with due diligence or whether they had knowledge of facts that would have led to actual knowledge in

the exercise of reasonable diligence. It is clear that they did. The articles did not say simply that Sumitomo Corporation did its banking with defendants and that defendants might suffer losses as a result of their banking role; they said that the Commodities Futures Trading Commission was investigating who might have helped Yasuo Hamanaka arrange fictitious trades and that defendants were among the institutions that took an active part in those transactions. One does not have to be a sophisticated corporation to infer a possible connection between "who helped" and "the institutions that took an active part in those transactions."

Next, the court considered the plaintiffs' argument that, at least with respect to Morgan, the statute of limitations was tolled on grounds of equitable estoppel or fraudulent concealment. To support this point, plaintiffs alleged that Morgan had concealed its involvement in the conspiracy in several ways: by entering into confidentiality agreements in the lawsuits and investigations with which it was involved; by giving untruthful statements to the New York State Banking Department and the New York Federal Reserve Bank during their investigation; by allowing its head of media relations in London to destroy a notebook containing his notes of conversations with media contacts; and by declining to give information to the London Metals Exchange about a customer of Morgan Guaranty Trust Company. The court was unpersuaded. It found instead that each one of these actions could be characterized only as a denial of liability.

Even if that were not the case, the court found, the plaintiffs acted too slowly in bringing their suit. It explained that by August 13, 1999, the date on which Sumitomo's complaint against Morgan was unsealed, the plaintiffs "had the requisite factual support to sue defendants for violation of the antitrust laws," a claim the court

noted that plaintiffs conceded. Relying on its previous holding that the claim accrued on July 23, 1996, this meant that plaintiffs still had eleven months after Sumitomo revealed its complaint to file suit before the four-year statute of limitations expired on July 23, 2000. Plaintiffs filed this case on December 30, 2002, more than six and a half years after the accrual—too late, in the district court's view.

Finally, the court concluded that the statute of limitations was not tolled during the pendency of certain state antitrust class actions that had been filed against Sumitomo and Morgan. In order to benefit from the tolling rule for plaintiffs covered by a class action announced in the Supreme Court's decision in *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538 (1974), the court ruled, identical legal theories must be involved in both cases. Both the Asarco Group and Southwire were unnamed class members in a class action that had been filed in California state court on July 8, 1996, *Heliotrope General, Inc. v. Sumitomo Corp.,* No. 701679 (Cal. Super. Ct. 1996) (*Heliotrope I*). The class in *Heliotrope I* was defined as businesses that "purchased copper-based products and paid prices for such copper-based products that were inflated due to the defendants' manipulative and unlawful actions." On February 14, 2000, Morgan was added as a defendant to the *Heliotrope I* litigation action. In June 2000, the *Heliotrope I* litigation was abandoned, but on June 5, 2000, a group of plaintiffs filed a new action, *Heliotrope General, Inc. v. Credit Lyonnais Rouse, Ltd.,* No. 749280 (Cal. Super. Ct. 2000) (*Heliotrope II*), that included Morgan as a defendant. The California Superior Court granted class certification in *Heliotrope II* on January 22, 2003. All of the plaintiffs except for Southwire opted out of the *Heliotrope* litigation on March 21, 2003. (Although the court initially rejected plaintiff Asarco's request for exclusion, the court granted it on June 20, 2003.) Plaintiff

Southwire filed its opt-out request for *Heliotrope II* on March 22, 2003.

If the time between the commencement of *Heliotrope II* and the date when the various plaintiffs opted out of the state class did not count against the four-year limitations period, then the suit against Morgan filed at the end of 2002 was easily brought in time. The district court concluded that this time is excludable only if the *American Pipe* rule makes it so. It then found that *American Pipe* did not save the plaintiffs' actions "[b]ecause the Heliotrope actions did not involve the same causes of action as those in plaintiffs' present case against defendants, plaintiffs may not claim any tolling benefit from the Heliotrope class actions." Although the court also found that the plaintiffs could benefit from tolling under *American Pipe* and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), for the federal antitrust class action filed against Morgan in *Loeb Indus., Inc. v. J.P. Morgan & Co.*, No. 00-C-274-C (W.D. Wis. 2000) (*Loeb II*), this time period was not great enough to make a difference. The court calculated that *Loeb II*'s tolling benefit ran from the day the complaint was filed on May 8, 2000, until January 2, 2001, the day the district court dismissed the action, for a total of seven months and 25 days. The court rejected the plaintiffs' contention that the period lasted during the pendency of the earlier appeal to this court that culminated in *Loeb I*.

Finally, the court declined to answer the question whether the tolling agreements entered into by the defendants in the *In re Sumitomo Copper Litigation*, No. 96 Civ. 4584 (MP) (S.D.N.Y.), tolled the statute of limitations in this case. Even if the agreements had that effect, they would not have sufficed to save the plaintiffs' claims from dismissal, assuming the accuracy of the court's choice of the date of accrual and the unavailability of any other ground for tolling.

## II

We review a district court's grant of summary judgment *de novo,* taking all facts in the light most favorable to the non-moving party. See, *e.g.*, *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). An award of summary judgment is proper when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Here, plaintiffs present three arguments for reversing the district court: (1) material issues of fact exist on the question whether their claims against Morgan accrued on July 23, 1996; (2) material issues of fact exist on the question whether the statute was tolled by the doctrine of fraudulent concealment; (3) even if their claims accrued on June 14, 1996 (for Southwire's claims against Sumitomo and Global), and July 23, 1996 (for all claims against Morgan), as the district court held, the cases are timely because the statute of limitations was tolled as a matter of law during the pendency of the state court class actions. This opinion addresses only the first two of these points in detail. Judges Cudahy and Rovner have rejected the third argument, for the reasons explained in Judge Cudahy's separate opinion.

### A.  The Accrual Date of Plaintiffs' Antitrust Injuries

The plaintiffs argue that the district court improperly selected July 23, 1996, as the date on which their claims accrued and contend instead that August 13, 1999, the date on which Sumitomo's complaint against Morgan was unsealed, is the proper date. Plaintiffs further argue that even if their actions accrued as early as 1996, they should benefit from tolling under the doctrine of fraudulent concealment because of Morgan's efforts to hide its involvement with Sumitomo's price-fixing. We first address the question of accrual. Whether the district court selected the

proper accrual date depends on the application of the discovery rule to these facts.

As an initial matter, plaintiffs' antitrust claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b; see also *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued'. . . ." (quoting 15 U.S.C. § 15b)). Generally, an antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith*, 401 U.S. at 338. As in other areas of the law, however, in the absence of a contrary directive from Congress this rule is qualified by the discovery rule, which "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." See *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). "This principle is based on the general rule that accrual occurs when the plaintiff discovers that 'he has been *injured* and who *caused* the injury.'" *Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004) (quoting *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000) (emphasis in original)).

Plaintiffs discovered that they had suffered some kind of injury on June 13, 1996, when Sumitomo announced that it had incurred almost $1.8 billion in losses from its illegal activities. At this point, the plaintiffs knew that their businesses had been injured by *Sumitomo*'s actions, but they did not know that Morgan might also be liable. As the district court noted, however, several articles indicated that Morgan had financed Sumitomo's copper transactions. The district court thought that the plaintiffs should have suspected Morgan's possible culpability by July 23, the date when the Associated Press reported that Morgan and other banks were under investigation by the Commodities

Futures Trading Commission (CFTC), because by this date, "plaintiffs had enough information to trigger their obligation to make further inquiry." The court concluded that whether it applied the discovery rule to when the claim accrued or the fraudulent concealment doctrine to toll the statute of limitations, by July 23 the plaintiffs "knew enough to suspect a violation that they could have detected with due diligence." Absent any alleged wrongdoing on Morgan's part, the court thought that the plaintiffs should have known of Morgan's liability too.

The problem is that in making its determination, the court never explained what facts the plaintiffs' diligent inquiries would have revealed. (Sumitomo, it should go without saying, was in a different position; as a party to the deals with Morgan, it had access to information that was not accessible to outsiders.) The court cites several articles that mentioned Morgan and its loans to Sumitomo in June and July 1996, none of which indicated that Morgan's actions were unlawful or even that Morgan knew about Sumitomo's fraudulent transactions. Even the articles published in the spring of 1997 reporting the federal investigation of Morgan did not state that Morgan had been charged with violating the law. For example, on April 3, 1997, *The Wall Street Journal* reported that state and federal authorities reprimanded Morgan after their investigation of Morgan's financing the trades of Yasuo Hamanaka, Sumitomo's key copper trader. The article suggested that Morgan may have had knowledge of Hamanaka's purposes behind the loans and it referred to a six-month federal investigation, but it stopped short of saying that Morgan had been charged with violating any laws.

Perhaps most significantly, as the district court noted in its opinion, Morgan was not named in any copper litigation until February 2000, six months after Sumitomo

unsealed its complaint against Morgan. See *R.W. Strang Mechanical v. Sumitomo Corp.,* No. 701680 (Cal. Super. Ct. 1996) (complaint amended to add defendant Morgan on February 14, 2000); *Heliotrope I,* No. 701679 (Cal. Super. Ct. 1996) (complaint amended to add defendant Morgan on February 14, 2000); *Nat'l Metals, Inc. v. Sumitomo Corp.*, No. 734001 (Cal. Super. Ct. 1999) (complaint amended to add defendant Morgan on February 14, 2000); *Heliotrope II,* No. 749280 (Cal. Super. Ct. 2000) (complaint filed against defendant Morgan on June 5, 2000); *Loeb Indus., Inc. v. J.P. Morgan & Co.*, No. 00-C-0274-C (W.D. Wis. 2000) (complaint filed on May 8, 2000); *Ocean View Capital, Inc. v. J.P. Morgan & Co.*, No. 00-CV-3756 (S.D.N.Y. 2000) (filed May 17, 2000). The district court cited these cases in support of its belief that plaintiffs could have filed their cases before July 23, 2000, four years after the accrual date the court selected. But if the soonest that the plaintiffs were put even on inquiry notice about Morgan's role was late 1999, that was when the four-year period began to run; plaintiffs were not left facing only an equitable extension of time dating from some earlier point.

Under these circumstances, we conclude that a dispute of material fact exists regarding when a diligent inquiry on the part of the plaintiffs would have revealed Morgan's involvement. The only information available in the public domain was insufficient to suggest activities on Morgan's part that went beyond the normal role of a financial institution. The press had reported that Morgan was financing some of Sumitomo's trades; that it was engaged in hedging deals in the copper market; that it may have participated in loan agreements supporting the Hamanaka trades; that it was trading in derivative contracts; and that the CFTC was investigating someone. We do not see how this amounts to indisputable evidence of inquiry notice that Morgan had stepped over any legal lines.

### B. Equitable Estoppel and Fraudulent Concealment

The facts taken in the light most favorable to the plaintiffs also support a finding that equitable estoppel should be invoked to toll the statute of limitations. In their appeal, plaintiffs allege that Morgan affirmatively acted to conceal its involvement using a variety of mechanisms: confidentiality agreements; its separation agreement with Keith Murphy, Morgan's former head of its base metals desk, prohibiting him from disclosing confidential business information in exchange for $225,000; its media strategy; the destruction of evidence; and the withholding of information or giving of false information to regulatory investigations.

"Equitable estoppel [in the statute of limitations context] suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing." *Barry Aviation*, 377 F.3d at 689 (internal citation omitted). The typical example of equitable estoppel is when a defendant "promis[es] the plaintiff not to plead the statute of limitations pending settlement talks." *Singletary v. Continental Ill. Nat'l Bank and Trust Co. of Chicago*, 9 F.3d 1236, 1241 (7th Cir. 1993). Fraudulent concealment is a type of tolling within the doctrine of equitable estoppel. Fraudulent concealment "presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *Cada*, 920 F.2d at 451. In order for a plaintiff to benefit from tolling for fraudulent concealment, he must show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997) (holding that "reasonable diligence" was

required to invoke the doctrine of fraudulent concealment in the context of civil RICO by analogy to antitrust cases).

The district court found that the plaintiffs could not benefit from tolling on the ground of fraudulent concealment because "[t]o sustain such a claim at trial, plaintiffs would have to prove that defendants took active steps to prevent plaintiffs from suing before the statutory deadline."

> After reviewing considerable quantities of discovery materials, plaintiffs have unearthed three incidents that they contend add up to obstructionism sufficient to entitle plaintiffs to claim equitable estoppel. Defendants' managing director of global commodities made an allegedly untruthful statement to examiners of the Federal Reserve Bank and New York State Banking Department that defendants had had no suspicion about Hamanaka's dealings and no concern that a March 1996 trade with Sumitomo was unauthorized; defendants' London head of media relations destroyed a notebook containing his notes of conversations with media representatives; and J.P. Morgan Securities Ltd., an entity related to defendant J.P. Morgan Chase, declined to give information to the London Metals Exchange about a customer of defendant Morgan Guaranty Trust Company. These three incidents add up to nothing of significance.

In our view, this does not do justice to the facts the plaintiffs have presented for purposes of the summary judgment motion. Plaintiffs began by pointing out that Morgan was not contesting the fact that it had engaged in fraudulent concealment prior to June 17, 1996. Other representative facts plaintiffs proffered included the following: (1) Morgan provided false information to authorities, by telling them that Hamanaka's trades were fully authorized by Sumitomo's top management when it knew that they were not; (2) Morgan publicly offered innocent

alternative explanations to explain away events related to the price-fixing conspiracy, knowing that they were misleading; (3) Morgan affirmatively instructed other conspirators not to divulge the existence of the conspiracy; and (4) in violation of Morgan's record retention policy, its Head of Media Relations in London destroyed the notebooks in which he recorded information about his contacts with the press. Most suspiciously, almost two years after it fired Murphy, who had headed Morgan's base metals business for a time and who was at the heart of the arrangements with Sumitomo, Morgan entered into an agreement with him requiring that he not disclose any information relating to the business and that he give Morgan notice of and an opportunity to resist any subpoenas. Notably, the silence was not simply vis à vis the press; it was directed toward official inquiries. In exchange for these promises, Morgan made a generous special payment of $225,000 to Murphy and "reinstated" options for approximately 7,000 shares of Morgan stock, which Murphy had forfeited at the time of his forced resignation.

We certainly do not rule out the possibility that Morgan may have explanations for its actions. That is not the point. At the summary judgment stage, this evidence is enough to show that material facts are in dispute as to whether plaintiffs can benefit from tolling under fraudulent concealment. See, *e.g.*, *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832-33 (11th Cir. 1999) (reversing a district court's grant of summary judgment for defendants because material facts existed on plaintiffs' claim regarding fraudulent concealment). In *Morton's*, the Eleventh Circuit noted the "stringent" standard of review at summary judgment for determining whether the defendants' conduct "prevented the plaintiff from discovering his claim prior to the expiration of the limitations period." *Id.* at 832. The court stated that, "[i]t is not enough for summary judgment to point to facts which *might* have caused a plaintiff to

inquire, or *could* have led to evidence supporting his claim. A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment. To award summary judgment on such a showing is error." *Id.* at 832-33 (emphasis in original).

Similarly here, defendants answer the plaintiffs' evidence only with references to articles that reveal information about Morgan's loans to Sumitomo that, it contends, should have prompted further inquiry. But this evidence does not, by itself, erase the contrary evidence that the plaintiffs have proffered. The doctrine of fraudulent concealment protects "both the diligent and the non-diligent plaintiff . . . from the expiration of claims the factual basis for which was shrouded by the veil of fraudulent concealment." *Id.* at 836. While denying liability or failure to cooperate is not enough to invoke the doctrine of fraudulent concealment, see *Singletary*, 9 F.3d at 1241, plaintiffs went far beyond simple denials. We conclude that there are facts in dispute regarding Morgan's fraudulent concealment and on that basis we reverse the district court's summary judgment decision in favor of Morgan.

C.  Timeliness After Discovery

As we noted earlier, the district court found in the alternative that the plaintiffs acted too slowly in bringing their suit, regardless of questions of discovery or fraudulent concealment. It was on August 13, 1999, that Sumitomo's complaint against Morgan was unsealed, and it cannot be disputed that the revelation of the information in that complaint gave the plaintiffs the requisite factual support for an antitrust suit against Morgan. In fact, plaintiffs did not file their action until December 30, 2002, more than three years later.

Because the district court's view of the equities may have been affected by its conclusion that the correct accrual date was really July 23, 1996, we would reverse and

remand for further consideration of this point even if our only ground of disagreement related to the equitable estoppel or fraudulent concealment ground. Here, in addition, our holding (based of course on the summary judgment record) that the plaintiffs could not reasonably have discovered Morgan's role as early as the district court thought means that the court was not free to shorten the four-year limitations period in this way. Under the discovery rule, the statute does not begin running until the plaintiff discovers that he has been injured and who caused the injury. Here, the statute did not begin running until August 13, 1999, and thus the plaintiffs had until August 13, 2003, to file their action. That was a deadline they easily met.

D.   Tolling Based on *Loeb I*: Sumitomo, Global

Southwire hopes to save its claims against Sumitomo and Global through the argument that the statute of limitations was tolled during the pendency of the federal class action filed in *Loeb Indus., Inc. v. Sumitomo Corp.*, No. 99-C-377-C (W.D. Wis. 1999). The defendants respond that *Loeb I* tolled the statute of limitations only from the date when the action was filed on June 8, 1999, until the district court dismissed the action with prejudice on August 24, 2000. If they are correct, then Southwire is out of luck. If, on the other hand, the statute was tolled until September 20, 2002, when this court handed down its *Loeb* decision, then Southwire's case can go forward.

The general rule is that the judgment of a district court becomes effective and enforceable as soon as it is entered; there is no suspended effect pending appeal unless a stay is entered. There is no reason why the class certification question should somehow be exempt from this rule. *Culver v. City of Milwaukee,* 277 F.3d 908 (7th Cir. 2002), holds that the statute of limitations be-

gins running again as soon as class certification is denied or, as we added, as soon as a party opts out of a class. *Id.* at 914. At that point, the parties are on notice that they must take steps to protect their rights or suffer the consequences. This is particularly true now that FED. R. CIV. P. 23(f) makes it possible for parties to seek an interlocutory appeal of a class certification decision, but it was true as well before the advent of Rule 23(f). Furthermore, this rule is clear and easy to enforce. Southwire is therefore not entitled to take advantage of tolling from *Loeb I* beyond the date when the district court dismissed the case in its suit against Sumitomo and Global.

## III

In summary, we conclude that Morgan was not entitled to summary judgment with respect to the claims filed by plaintiffs Southwire and Asarco Group, because issues of fact pertinent to the date by which the plaintiffs should have discovered their claims and to the related questions of equitable estoppel and fraudulent concealment remain. We also conclude that the district court correctly granted summary judgment in favor of defendants Sumitomo and Global, because plaintiffs filed those claims too late. Judges Cudahy and Rovner also reject plaintiffs' contention that the statute of limitations was tolled as a matter of law during the pendency of the *Heliotrope* class actions, for reasons explained in Judge Cudahy's separate opinion. Judge Wood dissents on this point alone. The judgment of the district court is therefore AFFIRMED in part and RE-VERSED in part, and the case is REMANDED for further proceedings consistent with this opinion. Costs are to be taxed equally between Morgan, on the one hand, and the appellants, on the other.

CUDAHY, *Circuit Judge*, for the panel and concurring in Part II. The plaintiffs argue with respect to the *Heliotrope* California class action that membership in the *Heliotrope* class should not only toll the statute of limitations with respect to individual *state* antitrust claims but also the *federal* statute of limitations governing claims under the Clayton Act. Not only is there no suggestion in *American Pipe*, 414 U.S. 538, or in *Crown, Cork & Seal*, 462 U.S. 345, that these decisions construing Federal Rule of Civil Procedure 23 have any direct application to parallel state procedures, but the policies underlying *American Pipe* and like precedents simply do not apply in the cross-jurisdictional context.

The essential rationale of *American Pipe* is that members of a class whose claims are embodied in a class action should not be required by the exigencies of the statute of limitations to clutter the courts with duplicative lawsuits as long as their claims are encompassed by the class action. In other words, as long as they are in effect passively tendering their claims through inclusion in the class action, they should not be forced to proceed individually, whether by intervention or otherwise.

The situation contemplated by the plaintiffs here is, however, quite different. Here plaintiffs have become members of a class in a state class action but want the federal statute of limitations governing a factually similar federal claim to be tolled. But, in this situation the state claimants are not being *forced by the federal statute of limitations* to file duplicative claims since, in any event, it is necessary at some point to file suit in federal court if the plaintiff desires to invoke federal antitrust protection. This procedural requirement is unaffected by the status of an ongoing state class action.

Since filing in federal court is a prerequisite to pursuing a federal remedy regardless of the state class action, there

will be no efficiency gain whether the federal filing is made while the claimant is part of the state class action or later (or never). However similar or dissimilar the function of federal antitrust law may be with respect to state law, the federal claim is part of a distinct body of law that must be pursued in a wholly different court system. This fact cuts decisively against the application of the policies of *American Pipe* across jurisdictional lines to respond to state class actions, even if some federal interest in such an application could be divined.

Another way of approaching this problem is to recognize that Rule 23 allows litigants to protect their rights passively—to "sit on the sidelines," so to speak—without individually asserting their own claims in accordance with the theory that someone else is making identical claims on behalf of silent and absent class members. The key difference between an ordinary Rule 23 situation and the present case is that no one here is asserting a *federal* claim for those sitting on the sidelines. No one has filed a federal antitrust claim at all, and no one may *ever* file a federal antitrust claim. Hence, tolling the federal statute of limitations may be a futile gesture of benefit to no one.

Judge Wood in dissent asserts that "different tribunals that entertain fundamentally the same case should not be hermetically sealed off one from the other." Dissent of Wood, J., at 31. But this rhetorical conclusion overlooks the fact that, however similar the purposes of federal and state litigation, they must still be maintained by filing complaints and pursuing remedies in different courts. This fact may be decisive for procedural issues like the one here. The issue before us is a federal issue to be decided under federal law. If it were a state issue, there is no reason to believe that California would purport to toll the limitation contained in the Clayton Act, no matter how similar a Clayton Act claim might be to the claim under a California

antitrust statute that was the subject of a state class action (like *Heliotrope*). This conclusion is particularly inescapable in light of California's analogous refusal even to apply its law of claim preclusion (*res judicata*) to federal antitrust claims that are factually similar to state claims.

> Under California preclusion law, in order for *res judicata* to apply to claims not raised in previous proceedings, the court rendering the prior judgment must have jurisdiction to hear such claims. . . . Because federal antitrust claims are within the exclusive jurisdiction of the federal courts . . . [a] California court . . . would have had no jurisdiction over . . . federal antitrust claims. Therefore, applying California *res judicata* principles, [a] prior California suit cannot preclude [the similar] federal action.

*Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1437 (9th Cir. 1985) (citations omitted).

The reference by Judge Wood to *issue* preclusion as somehow relevant to the tolling of the statute of limitations is wide of the mark. Here, the state claims have never been fully litigated, and the issues eligible to be precluded are therefore unknown. The fact that some issues in the federal courts may someday be precluded by state decisions is not a good reason to delay the corresponding federal actions by tolling the statute of limitations (thereby arguably increasing the chance of preclusion).[1] Judge Wood also argues that

---

[1] If we understand Judge Wood's invocation of *Marrese v. Am. Acad. of Ortho. Surgeons*, 470 U.S. 373 (1985) and the point that a state judgment might "in some circumstances have a preclusive effect" on a subsequent federal action, as to *claim* preclusion (as we note above), this is certainly not the case in California. On the other hand, preclusion of federal *issues* by a prior state judgment will certainly not be avoided by tolling the fed-

(continued...)

somehow fairness, efficiency and like values will be advanced if a state antitrust class action can effect a tolling of the federal statute of limitations applicable to the Clayton Act. As we have pointed out, this is simply not the case. If an unnamed member of the state class wishes also to sue under the Clayton Act, the member must at some point bring a suit in federal court. If the requirements of the statute of limitations result in the federal suit's being brought while the state class action is pending, there is no inefficiency or unfairness. The plaintiff has simply invoked an additional statutory right at an appropriate time.

It merely confuses the issue to suggest that the Class Action Fairness Act (CAFA), Pub. L. 109-2, 119 Stat. 4 (2005), has anything to do with the issue. If a state class action is removed to federal court—diversity having been found—the substantive law involved is still state law. Claims under an analogous federal statute have not been invoked, and they are not implicated. Similarly, *Johnson v. Railway Express, Inc.*, 421 U.S. 454 (1975), relied on by the district court, has been properly invoked because it illustrates the principle that there must be identity of claims for tolling to be operative. It would appear *a fortiori* that, if the second claim is not only under a different statute but under a statute in another jurisdiction

---

(...continued)

eral statute of limitations and delaying the federal lawsuit. As to the possibility that a federal suit will never be brought, the statute of limitations applicable to such a suit is, of course, irrelevant in the circumstances. But if the problem is that preclusion principles may ultimately provide an affirmative defense to a federal suit, this is certainly not a reason to toll the federal statute of limitations and delay the filing of a federal action.

(federal) and invokable only in a different court system (federal), tolling would not be appropriate.

*Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987), cited by Judge Wood, contains dicta that are clearly distinguishable and, in addition, have provoked a telling dissent. First, in *Cullen*, the claims under RICO and 42 U.S.C. § 1983 were subject to the three-year limitations period *imposed by state law*. The court noted that when a federal court looks to state law to determine the most appropriate statute of limitations, it must also, so long as federal policy is not offended, apply the state's rules as to the tolling of the statute. This situation, then, contemplates the involvement of state law in a way that the Clayton Act—with its own statute of limitations and exclusive federal jurisdiction—does not. State courts have the power to adjudicate both RICO and § 1983 cases along with federal courts; only federal courts are competent to hear Clayton Act cases. Thus, it is more palatable to permit state litigation to toll state-based statutes of limitation with respect to claims that could actually be adjudicated in state courts.[2] Here, however, Judge Wood would allow an action in a jurisdictionally incompetent tribunal to toll the limitation for a lawsuit that it could never hear.

Further, Judge Meskill's partial dissent points out the pitfalls in pushing *American Pipe* beyond its own rationale. He argued that the majority had broadened the *American Pipe* rule to an unwise extent, quoting Justice Powell's

---

[2] This, of course, is not to say that a state statute of limitations implicated by a federal class action might not be tolled under *American Pipe*. See*, e.g.*, *May v. AC&S*, 812 F. Supp. 934, 938 (E.D. Mo. 1993). That, of course, is not the issue here. The question here is claimed to be whether the limitations attaching to a federal statute may be tolled to improve the efficiency of a state class action. As we have noted, there is no efficiency gain here and no federal interest in tolling.

concurrence in *Crown, Cork & Seal* that "[t]he tolling rule of *American Pipe* is a generous one, inviting abuse." *Cullen*, 811 F.2d at 736 (Meskill, J., dissenting) (quoting *Crown, Cork & Seal*, 462 U.S. at 354 (Powell, J., concurring)). While California's antitrust statute might be "similar" to the Clayton Act, mere similarity is a murky standard for a matter as needful of certainty as the statute of limitations.

Nor are our conclusions undermined by the repeated assertion by Judge Wood that a major purpose of a statute of limitations is "to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Order of R.R. Tel. v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944). Judge Wood claims the bringing of a state class action asserting a state claim that is similar to a federal claim puts defendants on notice that they might be sued federally and leads to the preservation of evidence and memories. This might well be substantially correct, but notice alone is certainly not enough to toll the statute of limitations. A mere announcement of an intention to sue puts defendants on notice. No one contends, however, that this simple notice is sufficient to toll the statute. If notice were enough, there would be no reason to resume the running of the statute when a plaintiff opts out of the class or is otherwise removed from it. After all, opting out of the class does not withdraw the notice that has been given by filing the class action. *American Pipe* may claim the additional benefit from bringing a class action of notice to the defendant, but the driving force in that opinion is the gain to an efficient Rule 23 procedure of tolling the statute.

Functional equivalence, like simple notice, is not enough to trigger tolling. If functional equivalence were enough, then it ought to apply to individual claims as well, which certainly is not the law. For example, if multiple plaintiffs filed a joint suit against a defendant in state court and

one of those plaintiffs immediately dropped out, Judge Wood's functional equivalence rationale would seemingly toll the statute of limitations and permit that plaintiff to file her own "similar" lawsuit in federal court well beyond the normal statute of limitations. Since that plaintiff was originally part of the state lawsuit, the defendant plainly had notice of that plaintiff's "similar" claim. But notice is not enough; that plaintiff needs Rule 23 to protect her rights as a passive participant. We find the proposition that a defendant in state court can be on adequate notice that someday—two, five, ten or even more years down the road—a plaintiff might bring a functionally equivalent but not identical claim in federal court difficult to accept.

It should finally be noted that our conclusion supports one of the main purposes of the statute of limitations that Judge Wood identifies—to allow a defendant to be free of stale claims in due time. For all these reasons, the plaintiffs' participation in *Heliotrope* should have no effect on tolling the statute of limitations applicable to the Clayton Act.

On the other issue of when the plaintiffs' claims accrued, I concur, although I have some reservations, with the majority. The majority concedes that, by July 23, 1996, the plaintiffs knew, among other things, that Morgan and other banks were under investigation by the Commodities Futures Trading Commission. The district court believed that the plaintiffs at that time "knew enough to suspect a violation that they could have detected with due diligence." The majority, however, is doubtful that plaintiffs' diligent inquiries would have uncovered enough information to support a suit. Considering plaintiffs' highly expert, knowledgeable and well-compensated attorneys, I have somewhat less difficulty in postulating their capacity to uncover enough incriminating facts. There may be enough doubt here, however, to support the majority's conclusion.

On the issue of equitable estoppel and fraudulent conceal-
ment, I have similar reservations, but, again, there may be
a sufficient question to deny summary judgment. Hence, I
concur in the opinion authored by Judge Wood to the extent
that it speaks for a majority and in the judgment which it
supports but rely on my own opinion joined by Judge
Rovner with respect to the *Heliotrope* issue.

WOOD, *Circuit Judge*, dissenting in part.   Unlike my
colleagues, who conclude that a state-court class action like
*Heliotrope* cannot, as a matter of law, have an effect on the
statute of limitations applicable to the federal antitrust
class action here, I conclude that a federal court is both
entitled and obliged to take into account related activities
in a state court when it decides whether a federal class
action can go forward. My principal disagreement with the
majority's tolling analysis is that it reads as if *Marrese v.
Am. Acad. of Ortho. Surgeons,* 470 U.S. 373, 380 (1985)*,* in
which the Supreme Court stated that "a state court judg-
ment may in some circumstances have preclusive effect in
a subsequent action within the exclusive jurisdiction of the
federal courts," were never decided. Because of *Marrese*,
there will be a significant number of cases in which a state
antitrust claimant will not have the option, as the majority
puts it, of "at some point [ ] fil[ing] suit in federal court . . .
to invoke federal antitrust protection." Opinion of Cudahy,
J., at 20. Instead, because of the operation of 28 U.S.C.
§ 1738, the claimant will have to be content with the way
that the state courts protected the interests embodied in the
federal antitrust laws. It is not open to this court to second-
guess the wisdom of the holding of *Marrese*; instead, we
must base our interpretation of other parts of federal law,

including the class action rules and tolling principles, on a realistic appreciation of the degree of interdependence between state and federal antitrust claims that *Marrese* decreed.

The degree of weight any particular state court action must be given in a later federal case will vary, of course, depending on how related it is factually and legally to the federal litigation—there will be a potential range spanning from no weight at all, for wholly unrelated suits, to full-blown claim preclusion, under the principles articulated in *Marrese*. In the present case, the close identity between the facts and legal principles governing the state and federal cases are enough to require tolling the statute of limitations for the persons who were unnamed class members in the California suit. An examination of the pleadings in the *Heliotrope* litigation reveals that it covers exactly the same matters that the present suit involves. As unnamed members of the *Heliotrope* class, the plaintiffs here had no ability to control the course of that litigation. Moreover, had plaintiffs stayed in the *Heliotrope* litigation and the court had finally resolved such critical questions as relevant market and effect on competition, they would probably have faced issue preclusion in any subsequent effort to invoke the federal antitrust laws. Under those circumstances, I would find that the *American Pipe* tolling rule applies and I would thus conclude that the plaintiffs' claims against Morgan are entitled to go forward without further fact-finding. Even with the benefit of class action tolling, however, I would find that Southwire's claims against Sumitomo and Global were time-barred.

I

I believe that it is common ground that *if* the plaintiffs are entitled to benefit from tolling during the *Heliotrope* litigation and the tolling period lasted long enough,

their claims against Morgan can proceed. I begin, therefore, with a discussion of the legal principles that govern and then turn to the application of those principles to the plaintiffs' case.

### A.   *American Pipe* and Tolling

The question for this part of the case is whether the four-year statute of limitations in the Clayton Act should have been tolled during the pendency of the state antitrust action. Although federal courts have an obligation to respect state court proceedings—one that finds expression in federal statutes such as the Full Faith and Credit Act, 28 U.S.C. § 1738, and the Anti-Injunction Act, 28 U.S.C. § 2283—our primary duty here is to give proper scope to both the Clayton Act, 15 U.S.C. § 15b (four-year statute of limitations), and FED. R. CIV. P. 23. In my view, there is no *per se* rule that bars a federal court from tolling the Clayton Act's statute of limitations for litigants who earlier were unnamed members in closely related state court class litigation. Whether tolling is appropriate should depend upon both the factual and legal overlap between the two actions. If the earlier state court class action arises out of the same transaction or occurrence as the later federal class action, and the parties and claims are functionally identical, as I believe they are here, I would find that the federal interest in making a forum available to the unnamed members of the earlier class who have allegedly suffered from violations of the antitrust laws is strong enough to call for tolling.

My conclusion is consistent with the purpose that statutes of limitations are designed to serve. Justice Jackson summarized this purpose with characteristic eloquence in *Order of Railroad Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342 (1944):

> Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*Id.* at 348-49. In *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)*,* the Court observed that these goals are satisfied in the class action setting when the named plaintiff brings a putative class action and alerts the defendants "not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *Id*. at 555.

The Supreme Court has held that the same law should govern both a statute of limitations and the tolling principles that go along with it. See, *e.g.*, *Board of Regents v. Tomanio,* 446 U.S. 478, 485 (1980). Thus, in *Tomanio*, as well as in *Chardon v. Fumero Soto,* 462 U.S. 650, 662 (1983), both cases in which the federal courts were borrowing an analogous state statute of limitations for an action under 42 U.S.C. § 1983, the Court held that the state tolling rules had to be applied. This was so even though in *Chardon* the result, consistent with governing Puerto Rican law, was that the statute of limitations began running anew after class certification was denied in the first suit, rather than simply continuing after suspension. The Court acknowledged that *American Pipe* had required only suspensive effect, but it distinguished *American Pipe* on the ground that the antitrust case there was governed by a federal statute of limitations provided by the Clayton Act.

These cases suggest that here, where the question is whether to toll the Clayton Act's limitations period, the court should apply federal law to the issue rather than California law. (In the present case, as it happens, there is little difference between the federal and the state tolling rules. The California Supreme Court follows *American Pipe* when it serves the twin purposes that the court has recognized for that case's tolling rule—efficiency of the litigation process and protection of the defendant through adequate notice. *Jolly v. Eli Lilly & Co.,* 751 P.2d 923, 934-35 (Cal. 1988).) Federal courts have a broad interest in litigation efficiency even when an earlier lawsuit occurs in the courts of a state or even those of a foreign country. Indeed, both the federal law governing recognition and enforcement of foreign judgments and the law of many states presently take the position that foreign judgments should be recognized and enforced even if the issuing court would not give similar treatment to a U.S. judgment. See, *e.g.*, *Bank of Montreal v. Kough,* 612 F.2d 467 (9th Cir. 1980); *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (3d Cir. 1971); Uniform Foreign Money Judgments Recognition Act § 4 (not listing lack of reciprocity as a permissible ground for non-recognition); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 481-82 (1987). To the extent that courts and legislatures have eschewed a reciprocity rule, they are making the point that interests in both efficiency and fairness operate across judicial systems; different tribunals that entertain fundamentally the same case should not be hermetically sealed off one from the other.

A look at the *Heliotrope* litigation reveals that all relevant interests would be served here by tolling: efficiency, fairness to the unnamed plaintiff class members, and protection of the defendant through adequate notice. The claims in *Heliotrope* are functionally the same as those in the federal case, and the defendants were fully on notice of the alleged

misconduct of which they were accused. There is a separate question whether individuals who opt out of a certified class ought to be able to take advantage of tolling principles, but I am satisfied, based on the Supreme Court's decisions in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351-52 (1983), and *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176 n.13 (1974), that this too is appropriate, on the condition that the statute begins running again as of the date the opt-out becomes effective. (California would do the same thing. See *San Francisco Unified Sch. Dist. v. W.R. Grace & Co.-Connecticut,* 44 Cal. Rptr.2d 305, 318 (Cal. Ct. App. 1995).) Otherwise, parties who are swept into a class action by a self-designated class representative and who later assert their right to opt out will essentially be forced to remain in the class for reasons relating to limitations periods, rather than because they are satisfied with the representation they are receiving.

### B.   *Heliotrope* Class Actions

The district court found significance for tolling purposes in the fact that the *Heliotrope* class action was not based on the federal antitrust laws. Indeed it was not, because it could not have been. The Supreme Court has long understood the antitrust laws as conferring exclusive jurisdiction on the federal courts to adjudicate federal antitrust claims. See *Gen. Inv. Co. v. Lake Shore & Mich. S. Ry. Co.,* 260 U.S. 261, 287 (1922). But the plaintiffs' claims were brought under California's Cartwright Act (its state antitrust law), Cal. Bus. & Prof. Code §§ 16720-16770, and other states' antitrust laws. The first question thus should be whether it is enough to show as a matter of substance that different statutes underlay the two claims in order to defeat tolling under *American Pipe*.

It is helpful in this connection to recall the background of the *American Pipe* decision. There, the Supreme Court was

faced with an antitrust action initially brought by the State of Utah as a class action. After transfer to another district under the multidistrict litigation procedures, the transferee judge granted the defendants' motion to deny class certification. Eight days later, many of the unnamed members of the class moved to intervene. The district court denied that motion, finding that the four-year statute of limitations had run with respect to their claims, and that it had not been tolled during the pendency of the requested class action. The court of appeals reversed, and the Supreme Court upheld its decision, stating that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554.

To hold otherwise, the Court had explained earlier,

> would frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties—precisely the multiplicity of activity which Rule 23 was designed to avoid in those cases where a class action is found superior to other available methods for the fair and efficient adjudication of the controversy.

*Id.* at 551 (internal quotation marks omitted). The Court noted that this rule was also consistent with the purpose of ensuring that defendants were protected from claims by plaintiffs who have "slept on [their] rights." *Id.* at 554. In *Crown,* the Supreme Court extended *American Pipe'*s tolling rule to situations where the class action has been dismissed and those who would have been class members commence

an independent action instead of intervening. 462 U.S. at 350-51.

The *American Pipe* rule cannot be divorced from the class action context. In the case of ordinary litigation, in which A, B, and C file a lawsuit against X in state court, each of these plaintiffs is responsible—and knows that she is responsible—for protecting her own interests. Thus, if C immediately dropped out of the original lawsuit and failed to file a related action in federal court until after the expiration of the statute of limitations, she would be out of luck. Compare *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394 (1981) (holding that nonappealing plaintiffs could not avoid dismissal on *res judicata* grounds of new lawsuits raising essentially the same claims under federal and state antitrust law, even though appealing co-plaintiffs won a reversal on appeal). With either a federal or state class action, in contrast, the unnamed class members do not enjoy full party rights during the course of the litigation. See, *e.g.*, *Devlin v. Scardelletti,* 536 U.S. 1, 10-11 (2002) (unnamed class members are "parties" for purposes of tolling the statute of limitations; are not "parties" for purposes of defeating complete diversity; are "parties" for purposes of being bound by settlement); *Earley v. Superior Court,* 95 Cal. Rptr. 2d 57, 66 (Cal. App. Ct. 2000) ("[t]he structure of the class action does not allow absent class members to become active parties"); *Shapell Indus., Inc. v. Superior Court,* 34 Cal. Rptr. 3d 149, 155 (Cal. App. Ct. 2005) ("California courts recognize and preserve the rights of absentee class members [ ] even before the issue of certification has been determined."). Because there is no pertinent distinction between the way that California treats class actions and the way federal Rule 23 does, the fact that the first class action in this case happened to be in California is not enough to defeat tolling here.

In fact, although the Supreme Court has had no occasion to discuss the situation presented in this case, where the

first class action is in state court and the later individual
action is in federal court, I see no principled way to distin-
guish the two scenarios. For the reasons I have already
explained, the federal courts are not indifferent to the
existence of related litigation in state courts. To the con-
trary, as the recent passage of the Class Action Fairness Act
(CAFA), Pub. L. 109-2, 119 Stat. 4 (2005), illustrates,
federal    and    state    class    actions    are    becoming
more intertwined by the day. CAFA is designed to facilitate
the removal of state-law based class actions filed in state
courts to federal court, by permitting such removal when-
ever minimal diversity and special amount in controversy
rules are satisfied. Once in federal court, of course, federal
procedural rules (including Rule 23) will govern. See *Hanna
v. Plumer,* 380 U.S. 460 (1965). As a result of CAFA, federal
courts will inevitably be called upon to interpret and apply
state antitrust laws with increased frequency. The effect of
the federal court's judgment will be a matter of federal
common law, in accordance with the Supreme Court's
holding in *Semtek Int'l. Inc. v. Lockheed Martin Corp.,* 531
U.S. 497, 508 (2001). In general, the federal rule will be one
borrowed from the state in which the federal court is
sitting, unless that state law is "incompatible with federal
interests." *Id.* at 509.

The key question, once we know that we are dealing
with unnamed members of an earlier putative class, ought
to be how closely the two cases are related. As a matter
of substance, it is plain in the case before us that the
California suit and the current suit cover the same ground.
The *Heliotrope* litigation involved the same facts, evidence,
and witnesses as the present action. The two lawsuits
also involve virtually identical legal claims, albeit with
different statutory labels. The California Supreme Court
recognized in *Aguilar v. Atlantic Richfield Co.,* 24 P.3d 493
(Cal. 2001), that "section 1 of the Cartwright Act . . . like its
Sherman Act analogue, makes a conspiracy among competi-

tors to restrict output and/or raise prices unlawful per se without regard to any of its effects." *Id.* at 511. Indeed, in *Oakland-Alameda County Builders' Exchange v. F.P. Lathrop Constr. Co.,* 482 P.2d 226 (Cal. 1971), the state supreme court went so far as to hold that "[b]ecause the Cartwright Act is patterned after the federal Sherman Act and both have their roots in the common law, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act." *Id.* at 231 n.3.

It is also worth reiterating that had these individual plaintiffs remained members of the *Heliotrope* class, issue-preclusive effect would probably have arisen from the state litigation. *Cf. U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 628-29 (7th Cir. 2003) (explaining that Indiana state court ruling could have issue-preclusive effect on aspects of Sherman Act claim). *Marrese* instructs that the preclusion rules of California would govern. 470 U.S. at 375, relying on 28 U.S.C. § 1738. Even though it appears that a California court's ruling in a Cartwright Act case will not have *claim*-preclusive effects in a later Sherman Act claim, see *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1142 n.8 (9th Cir. 2003), because California does not apply *res judicata* to claims that the first forum was incompetent to hear, *issue* preclusion is another matter. Key questions such as the definition of relevant market, the competitive effect of restraints in that market, and antitrust injury to the plaintiffs would have been resolved in the state litigation, as long as California's other criteria for issue preclusion were satisfied. (California, like practically every state, has a five-part test for issue preclusion: (1) identity of issue, (2) actual litigation in prior proceeding, (3) necessarily decided, (4) final and on the merits, and (5) party against whom preclusion is sought must be same as, or in privity with, party to former proceeding. See *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.,* 29 Cal. Rptr. 3d 521, 536 (Cal. Ct. App.

2005), quoting *Lucido v. Superior Court,* 795 P.2d 1223, 1225 (Cal. 1990).) *Marrese* is not narrowly limited to questions of claim preclusion (nor, for that matter, is § 1738), see, *e.g.*, *Jaskolski v. Daniels*, 427 F.3d 456, 460-61 (7th Cir. 2005); its underlying message is that the state and federal antitrust laws are hardly strangers. If key findings in a state antitrust action will have issue-preclusive effect on a later federal antitrust claim, and those findings as a practical matter will dispose of the federal case, then the unnamed members of a class in the state court risk losing exactly the same rights that unnamed members of a federal class would stand to lose. The distinction between issue and claim preclusion, at least in instances like this one, is more formal than real.

I recognize, of course, that the policies behind statutes of limitations and *res judicata* differ in some respects. Statutes of limitations are concerned with the balance between the defendant's interest in notice and repose and the plaintiff's interest in vindicating her rights. In contrast, rules of *res judicata* and collateral estoppel (or if one prefers, claim and issue preclusion) are primarily concerned with putting an end to litigation. See, *e.g.*, David P. Currie, *Res Judicata: The Neglected Defense,* 45 U. CHI. L. REV. 317, 325 (1977) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 1 cmt. a (1942)). This interest in finality comes from the need to avoid waste of judicial resources (including the recognition that a person is entitled to only one full and fair adjudication of a claim), respect for the judgment of the first court, and the need to avoid harassment through repeated lawsuits. See generally Allan D. Vestal, *Rationale of Preclusion,* 9 ST. LOUIS U. L.J. 29 (1964). The common concern with efficiency and the right to a meaningful (but singular) opportunity to present one's claim to a court supports the application of the *American Pipe* rule.

Tolling here would recognize the near-identity of claims and transactions and at the same time further the

goals of FED. R. CIV. P. 23 to promote the fair and efficient adjudication of a controversy. As the Second Circuit explained, "limiting *American Pipe* tolling to the identical 'causes of action' asserted in the initial class action would encourage and require absent class members to file protective motions to intervene and assert their new legal theories prior to class certification, thereby producing the very results the New York courts seek to prevent by such tolling, [] court congestion, wasted paperwork and expense." *Cullen v. Margiotta*, 811 F.2d 698, 721 (2d Cir. 1987) (internal quotation marks omitted), *overruled on other grounds*, *Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143 (1987). Some of that protective litigation could easily end up in federal court either as a federal claim or as a state law claim based on diversity jurisdiction—a possibility that underscores further the federal interest in what goes on during the state court class action.

I am not persuaded, as the district court was, that *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975), requires a different result. *Johnson* involved the question whether the filing of a charge of employment discrimination with the EEOC for purposes of a Title VII claim had the effect of tolling the statute of limitations for a suit based on the same facts brought under 42 U.S.C. § 1981. The Supreme Court found that § 1981 and Title VII were "separate, distinct, and independent" avenues of relief, 421 U.S. at 461, and that the Title VII administrative filing did not toll the relevant limitations period for a § 1981 action (at that time, a period determined by borrowing from state law). The Court rejected the plaintiff's effort to rely on *American Pipe* to support tolling, commenting generally that in *American Pipe* there was "a substantial body of relevant federal procedural law"— presumably referring to Rule 23—that guided the decision. 421 U.S. at 466. Thus, both because *Johnson* did not involve a class action and

because it involved distinct legal claims, it does not preclude tolling in this case.

## II

The question remains how much time the plaintiffs have gained as a result of *Heliotrope* and which defendants the tolling affects. I address Morgan's situation first.

### A.   Application of Tolling Rules to Morgan

The Asarco Group argues that it is entitled to have the benefit of the period from the time when Morgan was added as defendant in February 2000 until the Asarco Group opted out of the *Heliotrope II* litigation on March 21, 2003. Southwire asserts that it too should benefit from tolling during the *Heliotrope* litigation against Morgan (as well as against Sumitomo and Global, whose position I address in a moment). Southwire filed its federal antitrust case on December 30, 2002, and it opted out of the *Heliotrope* litigation on March 22, 2003 (only one day after the Asarco Group did).

This court previously has held that "filing of a class action suit tolls the statute of limitations for all the members of the class, but when the suit is dismissed without prejudice or when class certification is denied the statute resumes running for the class members." *Culver v. City of Milwaukee*, 277 F.3d 908, 914 (7th Cir. 2002) (citations omitted); see also *Crown*, 462 U.S. at 354. Thus, when a court denies certification or dismisses an action, the tolling benefit ceases. Logically, the tolling benefit must also cease when the plaintiff opts out of the class and thereby forfeits its class membership. In this case, the California Superior Court ordered certification of the *Heliotrope II* class on

January 22, 2003, allowing the state antitrust claims against Morgan to go forward. Both the Asarco Group and Southwire were members of the *Heliotrope II* class, until they filed their opt-out requests on March 21 and 22, 2003, respectively. At that point, they communicated both to the court and to the defendants that they no longer intended to rely on the *Heliotrope* litigation to press their claims. As of March 21 and 22, therefore, both sets of plaintiffs ceased to benefit from the *Heliotrope II* litigation.

Although the majority has concluded that disputed questions of fact make summary judgment inappropriate for the claims against Morgan, the availability of class action tolling is important for the plaintiffs' claims against it. If accepted, tolling would eliminate the need to resolve those factual issues with respect to Morgan. Starting with July 23, 1996, which is the point of reference the district court used, approximately three years and six and a half months elapsed until Morgan was first added to *Heliotrope I* on February 14, 2000. With only a couple of days' slippage after the early June end of *Heliotrope I*, *Heliotrope II* took over on June 5, 2000. Even if the statute were running between July 23, 1996, and February 14, 2000, I would find that it was tolled during the period from February 14, 2000, to March 21, 2003, or for three years and 35 days (for Southwire, three years and 36 days). After March 21, 2003, plaintiffs therefore had approximately five and a half months left in which to file their actions against Morgan. They in fact filed these claims on June 13, 2003, a little less than three months after the statute of limitations restarted. Plaintiff Superior filed its action about a month later, on July 11, 2003. Both of these filing dates were well within the remaining five and a half month period available to the plaintiffs. This result would be no different if one were to choose the earlier date of June 14, 1996, as the date when the plaintiffs realized generically that they had been

injured, even though at that point they may not have known about Morgan's role in the injury.

Although Southwire is in a somewhat different position than the Asarco Group with respect to the timing of the new claim, nothing of consequence follows from this. Southwire indicated that it no longer intended to rely on the *Heliotrope II* class action to press its claims against Morgan when it filed its federal action against Morgan on December 30, 2002. Nevertheless, Southwire also had the same five and a half months from the time it was no longer involved in the *Heliotrope II* proceeding, because the tolling period *began* for it on February 14, 2000, even though it ended earlier. Southwire obviously filed its suit against Morgan within five months of December 30, 2002, because it filed on that very day.

### B.   Application of Tolling Rules to Sumitomo and Global

The situation of defendants Sumitomo and Global is different. Although Southwire also claims that the *Heliotrope* litigation operated to toll its claims against these two defendants, I conclude otherwise. The district court held that these claims accrued on June 14, 1996. The California Superior Court denied certification of the proposed *Heliotrope I* class on October 10, 1997, thus terminating the tolling benefit for the class action against Sumitomo. See *Culver*, 277 F.3d at 914. Even though the court's October 10, 1997, order was without prejudice and it later certified a class for settlement purposes, these circumstances do not support the conclusion that the case remained a putative class action along the lines envisioned by *American Pipe* and *Crown*. Clear rules are the best ones for the litigation process. Only confusion could result from a rule requiring every litigant to figure out whether a denial of certification was *really* a denial, or just a meaningless interim step. For these reasons, I would find

that Southwire's claims against Sumitomo and Global were untimely.[1]

For these reasons, I respectfully dissent in part from the majority's judgment.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[1] A detailed breakdown of the tolling process for Southwire's case may help. Starting with June 14, 1996, Southwire used up 24 days before *Heliotrope I* began on July 8, 1996. It then used up another 606 days between the October 10, 1997, denial of class certification and June 8, 1999, when the *Loeb I* litigation against Sumitomo and Global began. Another 858 days elapsed from the August 24, 2000, rejection of the *Loeb I* class until it filed suit on December 30, 2002. The total number of days was 1488, in excess of the 1461 days in four years.