In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2569

LAURA L. DIVANE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

NORTHWESTERN UNIVERSITY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-08157 — **Jorge L. Alonso**, *Judge*.

ARGUED MAY 23, 2019 — DECIDED MARCH 25, 2020

Before BAUER, MANION, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Laura Divane and other plaintiffs,[1] beneficiaries of employee investment plans, sued Northwestern University for allegedly breaching its fiduciary duties under the Employee Retirement Income Security Act, 29

---

[1] April Hughes, Susan Bona, Katherine, Lancaster, and Jasmine Walker.

U.S.C. § 1001, *et seq.* The district court found no breach. Neither do we, so we affirm.

## I

There are two ERISA defined-contribution plans at issue in this case: the Northwestern University Retirement Plan and the Northwestern University Voluntary Savings Plan. Under the Retirement Plan, participating Northwestern University employees can contribute a portion of their salary to their account and Northwestern makes a matching contribution. Employees participating in the Voluntary Savings Plan also contribute a portion of their salary, but Northwestern does not make a matching contribution. Both plans allow participants to choose the investments into which the money in their account is invested and to choose among the investment options assembled by the plans' fiduciaries. Each plaintiff participates in one or both plans.

Northwestern is the administrator and designated fiduciary of both plans. It assigned some of its fiduciary administrative duties to university officials[2] and established a Retirement Investment Committee comprised of individual university officers[3] who exercised discretionary authority in managing the plans' assets. All are named defendants in this suit, and we collectively refer to them as "Northwestern" or "defendants."

---

[2] These officials include the university's executive vice president, Nimalam Chinniah, and former executive vice president, Eugene Sunshine.

[3] The Committee members are Ronald Braeutigam, Kathleen Hagerty, Craig Johnson, Candy Lee, William McLean, Ingrid Stafford, and Pamela Beemer.

Displeased with the administration of the plans, plaintiffs sued Northwestern for allegedly breaching its fiduciary duties under ERISA. Plaintiffs' amended complaint[4] is massive: 287 paragraphs over 141 pages. Most of plaintiffs' allegations, though, are not specific to certain defendants or to the plans here. For example, plaintiffs object to a wide range or mix of investment options, noting that approach can overwhelm an unsophisticated investor. They believe too many choices leaves the average investor with the "virtually impossible burden" of deciding where to place their money.

Before October 2016, the plans offered investments through the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund (TIAA-CREF) as well as Fidelity Management Trust Company. The Retirement Plan offered 242 investment options, and the Voluntary Savings Plan offered 187 options. Among the available options were mutual funds and insurance company annuities.[5]

---

[4] Plaintiffs filed their initial complaint on August 17, 2016, alleging two counts for breach of the defendants' duties of loyalty and prudence due to unreasonable administrative and management fees and performance losses, and one count for failure to monitor designated fiduciaries. Plaintiffs filed an amended complaint on December 15, 2016, adding three additional counts for prohibited transactions based on the same alleged breach conduct. In both complaints, plaintiffs requested a jury trial.

[5] These options represent a variety of investment offerings ranging from conservative to more aggressive. The annuity options offered here included fixed annuities, which provide participants with the assurance that they will have a stable income in retirement, and variable annuities, which carry some additional risk for the investor but allow for the possibility of a greater return.

In the four months leading up to October, these options were narrowed into four tiered categories from which participants could select their preferred investments:

- *Tier 1*: Target-date mutual funds that automatically rebalance their portfolios to become more conservative as the funds reach their target dates;

- *Tier 2*: Five index funds with a pre-selected set of stocks that eliminate trading and selection costs;

- *Tier 3*: 26 actively managed funds in which a manager or management team selects stocks;

- *Tier 4*: A full-service, self-directed brokerage window through which the participant invests his or her plan assets.

By October, Northwestern had streamlined its investment offerings to about 40 options to enable "simpler decision-making by participants, reduce administrative expenses, increase participant returns, and provide access to lower cost shares when available." Appellant Br. at 9. Plaintiffs argue Northwestern's conduct in adjusting its offerings should be treated as proof that its pre-2016 offerings were imprudent.

One of the TIAA-CREF investments that remained available to plan participants post-2016 was the TIAA-CREF Traditional Annuity, a fixed annuity contract that returns a guaranteed, contractually specified minimum interest rate. The Traditional Annuity has "severe restrictions and penalties for withdrawal," including a 2.5% surrender charge if a participant withdraws the investment in a lump sum sooner than 120 days after the termination of her employment. TIAA policy dictates that if the Traditional Annuity is offered as part of an investment plan, that plan must also offer the TIAA-

CREF Stock Account fund and use TIAA as the recordkeeper for all TIAA offerings. Plaintiffs complain that the Stock Account charges excessive fees and has not historically performed well.

Among the fees included in a fund's expense ratio are costs for recordkeeping. Defined contribution plans require recordkeepers to track the amount of each participant's account and how the account is allocated among investment options. Recordkeepers also maintain websites for participants and sometimes provide investment advice or education materials. One way that plans (including those in this case) pay for recordkeeping is to have the fund that collects the expense ratio share part of the expense ratio with the recordkeeper.

Plaintiffs alleged Northwestern should have paid recordkeeping costs by assessing a flat annual fee based on the number of participants in each plan. Specifically, plaintiffs alleged that some of the plan funds charged retail-rate expense ratios to cover recordkeeping rather than institutional-rate expense ratios. According to plaintiffs, a reasonable rate for recordkeeping fees would have been $35 per participant per year. The amended complaint reflects that plan participants paid an average of $54 to $87 per year for the Voluntary Savings Plan and an average of $153 to $213 per year for the Retirement Plan.[6] Plaintiffs argued these expenses are even higher for plans that use multiple recordkeepers, as was the case here.

---

[6] Plaintiffs allege that in 2015, the Voluntary Savings Plan held $530 million and had 12,293 participants while the Retirement Plan held $2.34 billion and had 21,622 participants.

Six days before discovery was scheduled to close, plaintiffs sought leave to file a second amended complaint alleging four new counts for breach of fiduciary duty. Aside from the four new counts, the second amended complaint mirrored the causes of action and claims in the amended complaint. The four new counts alleged that Northwestern: (1) offered retail class funds as investment options instead of using their bargaining power to offer institutional class shares at lower prices; (2) violated Northwestern's Investment Policy Statement by failing to monitor investment performance and recordkeeping costs; and (3) allowed TIAA to access and use participant information to market its services to participants (two separate counts). These additional counts were based on information available to plaintiffs before discovery.

Plaintiffs sought monetary and injunctive relief and requested a jury trial and leave to file their proposed second amended complaint. Defendants moved to dismiss the amended complaint on every count, to deny leave to file the second amended complaint, and to strike plaintiffs' request for a jury trial.

## II

The district court granted defendants' motion to strike the jury demand, finding that the monetary relief sought by plaintiffs did not constitute damages but rather a form of equitable restitution that did not entitle plaintiffs to a jury trial. The court also denied plaintiffs' request for leave to file a second amended complaint and granted defendants' motion to dismiss the amended complaint on all counts.

In dismissing the amended complaint, the district court rejected plaintiffs' theory that Northwestern breached its

fiduciary duty by offering the Stock Account and allowing TIAA to serve as the recordkeeper for TIAA funds. First, as the court observed, "no plan participant was required to invest in the CREF Stock fund or any other TIAA-CREF product," so "any plan participant could avoid what plaintiffs consider to be the problems with these products … simply by choosing other options." *Divane v. Northwestern Univ.*, 2018 WL 2388118, at *6 (N.D. Ill. May 25, 2018). Moreover, "[t]he plans … had valid reasons to use TIAA-CREF as record keeper for its products." *Id.* According to plaintiffs' own allegations: "TIAA-CREF *required* the plans to use it as record keeper for its products and to offer [the] CREF Stock Account if the plans were going to offer the TIAA-CREF Traditional Annuity," a popular investing option. *Id.* The court concluded that "[i]t was prudent to keep the [TIAA-CREF] Stock Account as an option (which no one was required to choose) and to keep TIAA-CREF as record keeper for its own funds (which no one was required to choose) when the alternative was to subject some participants to [the] 2.5% surrender charge" imposed by the Traditional Annuity. *Id.*

Next, the district court rejected plaintiffs' claim that Northwestern breached its fiduciary duties by permitting excessive fees. Applying *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), the court held "there is nothing wrong, for ERISA purposes, with the fact that the plan participants paid the record-keeper expenses via … expense ratios." *Id.* at *8 (citing *Hecker*, 556 F.3d at 585 (holding the use of revenue-sharing for plan expenses did not amount to an ERISA violation)). Nor was Northwestern required to try to "find a record-keeper willing to take $35/participant/year," the rate that plaintiffs alleged was reasonable. *Divane*, 2018 WL 2388118 at *8. If plan

participants sought to keep expense ratios low, they had many investment options to do so.

In applying *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), the district court also rejected plaintiffs' claim that Northwestern breached its fiduciary duty because "the range of investment options was too broad." *Id.* at *8–9 (citing *Loomis*, 658 F.3d at 673–74 (holding that plans did not violate ERISA by offering additional funds participants did not want to choose)). The court explained that the "[p]laintiffs might have a different case if they alleged that the fiduciaries failed to make [the low-cost index funds preferred by plaintiffs] available to them." *Id.* at *8. But plaintiffs' allegations describe the freedom they had under the plans to invest in the fund options they wanted. *Id.* at *8–9 (plaintiffs "allege[d] that those types of low-cost index funds *were and are* available to them," showing that "the plans offered them the very types of funds they want[ed]."). The court concluded "these allegations [cannot] add up to a breach of fiduciary duty." *Id.* at *8.

The court further dismissed plaintiffs' claims that "the things [plaintiffs] allege to be breaches of fiduciary duty … also constitute transactions prohibited by ERISA." *Id.* at *9. These claims rest on the "[p]laintiffs' theory [that Northwestern] engaged in a prohibited transaction every time the plans paid fees to TIAA-CREF or Fidelity" for the same recordkeeping conduct alleged in the fiduciary duty claims. *Id.* The court found "plaintiffs' attempt to hang their prohibited transaction theory on § 1106(a)(1)(D)" ineffective.[7] *Id.*

---

[7] 29 U.S.C. § 1106(a)(1)(D) prohibits the plan fiduciary from engaging in a transaction that he knows or should know would constitute a direct or

Once collected as an expense ratio by a TIAA-CREF fund or a Fidelity fund, the amount of the recordkeeping fees "became the property of the respective mutual fund," and "[t]hus, the transfer of some of it for recordkeeping costs was not a transfer of plan assets." *Id.* (citing *Hecker*, 556 F.3d at 584 (rejecting argument that revenue sharing constituted a transfer of plan assets "[o]nce the fees are collected from the mutual fund's assets and transferred to [the recordkeeper], they become [the recordkeeper's] assets—again, not assets of the Plans")). The court concluded "that plaintiffs have plead the ingredients of [an affirmative] defense" by providing evidence "that the fees paid were reasonable, as a matter of law." *Id.* at *10 (quoting *United States Gypsum v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003) (only appropriate time to dismiss a claim based on an affirmative defense is when plaintiff "plead[s] [himself] out of court by alleging (and thus admitting) the ingredients of a defense.")).[8]

In denying plaintiffs' motion for leave to file a second-amended complaint, the district court found the proposed new counts were untimely, futile, and abandoned. "[A]fter more than a year of discovery," *id.* at *11, and within just six days of the close of discovery, plaintiffs sought to add four new counts. The court separately analyzed each. On proposed Count VII, alleging Northwestern should have offered investment options at below-retail prices, the court found "that many of the facts underlying this count were alleged in

indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

[8] The court also considered plaintiffs' failure-to-monitor claim and dismissed it as abandoned. *Id.* at *11.

plaintiffs' amended complaint, such that plaintiffs could and should have added this count sooner." *Id.* The court also found the count futile for failing to state a claim and abandoned because plaintiffs did not respond to defendants' arguments.

With respect to proposed Count VIII, alleging that the Retirement Investment Committee violated its investment policy statement, the court found the claim to be both futile and untimely because plaintiffs had knowledge of the relevant allegations for at least eight months and "[w]aiting until the final few days of a discovery period that had lasted more than a year was undue." *Id.* at *13–14. Regarding proposed Counts IX and X, alleging Northwestern improperly allowed TIAA to access and use participant data, the court held that both claims were futile because it was "in no way imprudent" to allow TIAA access to participants' information as necessary "to serve as a record keeper." *Id.* at *12. The court noted plaintiffs' failure to "cite[] a single case in which a court has held that releasing confidential information or allowing someone to use confidential information constitutes a breach of fiduciary duty under ERISA" or "that such information is a plan asset" in a prohibited transaction. *Id.*

Finally, in granting defendants' motion to strike the jury demand, the district court acknowledged ERISA's historical roots in trust law, which provides equitable, but not legal, remedies. *Divane v. Northwestern Univ.*, 2018 WL 1942649 at *1 (N.D. Ill. April 25, 2018) (citing *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015) (noting that ERISA fiduciary law is derived from trust law)). In considering ERISA's "statutory antecedents," this court has concluded that plaintiffs have no right to a jury trial in ERISA cases. *See Patton v. MFS/Sun Life Fin.*

*Distrib., Inc.*, 480 F.3d 478, 484 (7th Cir. 2007); *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 576 (7th Cir. 2007); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998). Recognizing this court's precedent, the district court denied plaintiffs' request for a jury trial. *See Divane*, 2018 WL 1942649 at *3.

### III

On appeal we review whether the district court erred by dismissing plaintiffs' amended complaint for failing to state a claim for relief under ERISA, denying plaintiffs' request to file a second-amended complaint, and rejecting plaintiffs' demand for a jury trial. For the reasons below, we find no error.

### A

This court reviews dismissals under Federal Rule of Civil Procedure 12(b)(6) de novo and may affirm the district court's decision on any ground for dismissal contained in the record. *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 910 (7th Cir. 2013); *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017). "We construe the complaint in the light most favorable to plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor." *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). But we "need not accept as true statements of law or unsupported conclusory factual allegations," *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009), or "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007).

A district court may dismiss a claim pursuant to Rule 12(b)(6) if plaintiff fails to "state a claim upon which relief can

be granted." FED. R. CIV. P. 12(b)(6). A complaint must "give the defendant fair notice of what … the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a plaintiff need not provide detailed factual allegations, mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Id.; see also Iqbal*, 556 U.S. at 678–79 (the notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). Instead, to survive a motion to dismiss, a claim must be plausible. *Iqbal*, 556 U.S. at 679 (finding the court must be able to infer from the allegations "more than the mere possibility of misconduct"); *see also Twombly*, 550 U.S. at 570 (allegations must "nudg[e] [plaintiff's] claims across the line from conceivable to plausible"). When claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable. *See Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) ("[A] prudent fiduciary in the same position could not have concluded that the alternative action would do more harm than good.") (cleaned up); *see also Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011) (no "hypothetical prudent fiduciary" would have made the same objective choice).

Plaintiffs have alleged Northwestern breached its fiduciary duty as a prudent investor, and they now seek relief under ERISA, 29 U.S.C. §§ 1132(a)(2) and 1109(a). As the plans' fiduciary, Northwestern is required to "discharge [its] duties with respect to the plan[s] solely in the interest of the participants and beneficiaries" in a manner that "defray[s] reasonable expenses of administering the plan[s]" and "with the care, skill, prudence, and diligence … that a prudent man" would use. 29 U.S.C. § 1104(a). In their amended complaint, plaintiffs specifically alleged that Northwestern failed to act as a

prudent fiduciary when it included the  Stock Account as a plan investment offering and allowed TIAA-CREF to serve as a recordkeeper for its funds (Count I); created a multi-entity recordkeeping arrangement (Count III); and provided investment options that were too numerous, too expensive, and underperforming (Count V). In Counts II, IV, and VI, plaintiffs claimed the above conduct also constituted prohibited transactions under ERISA. *Id.* § 1106.

**1**

Plaintiffs alleged Northwestern breached its fiduciary duty by "allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account" in the plans and by allowing TIAA to serve as recordkeeper for its funds. Plaintiffs' own allegations, though, contradict this claim. As plaintiffs note in their amended complaint, many plan participants invested money in the Traditional Annuity, which was an attractive offering because it promised a contractually specified minimum interest rate. Plaintiffs do not allege it was imprudent for the plans to offer the Traditional Annuity. Instead, plaintiffs object to the plans offering additional TIAA products (including the Stock Account) and to TIAA serving as the recordkeeper for those products. This ignores the benefit of using TIAA as a recordkeeper—under that arrangement, the plans were able to offer participants continued access to the popular Traditional Annuity.

Assuming plaintiffs' allegations are true, they fail to show an ERISA violation. Under the plans, no participant was required to invest in the Stock Account or any other TIAA product. Any participant could avoid what plaintiffs consider to be the problems with those products (excessive recordkeeping fees and underperformance) simply by choosing from

hundreds of other options within a multi-tiered offering sys-
tem. Participants were not bound to the terms of any TIAA
funds simply because they were included in the plans. The
allegations instead depict valid reasons for the plans to use
TIAA as a recordkeeper and to keep the Stock Account as an
*option* for participants. According to plaintiffs' own allega-
tions, TIAA required the plans to use it as a recordkeeper for
its products and to offer participants the Stock Account if the
plans offered the Traditional Annuity. Given the favorable
terms and attractive offerings of the Traditional Annuity,
which are outlined in plaintiffs' amended complaint, it was
prudent for Northwestern to accept conditions that would
ensure the Traditional Annuity remained available to partici-
pants. This is especially true considering participants with
existing Traditional Annuity funds would be subject to a sur-
render charge of 2.5% if that offering was removed.

Rather than compare Northwestern's actions to those of a
"hypothetical prudent fiduciary," *Renfro*, 671 F.3d at 322,
plaintiffs criticize what may be a rational decision for a busi-
ness to make (and, indeed, several do) when implementing an
employee benefits program. But "[n]othing in ERISA requires
employers to establish employee benefits plans. Nor does
ERISA mandate what kinds of benefits employers must pro-
vide if they choose to have such a plan." *Lockheed Corp. v.
Spink*, 517 U.S. 882, 887 (1996). That plaintiffs prefer low-cost
index funds to the Stock Account does not make its inclusion
in the plans a fiduciary breach.

In *Loomis*, this court acknowledged the difficulty with try-
ing to enforce benefit program preferences through ERISA.
We noted:

> Plaintiff's theory is paternalistic. … [T]hey want the judiciary … to make [non-preferred] investments impossible. … [The plan sponsor here] offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense, low-risk, modest-return bond funds. It has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this.

*Loomis*, 658 F.3d at 673–74 (affirming dismissal of claims, noting "the absence from ERISA of any rule that forbids plan sponsors to allow participants to make their own choices"). The same logic applies here and leads us to again conclude that it would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options.

**2**

Plaintiffs also alleged Northwestern breached its fiduciary duties by establishing a multi-entity recordkeeping arrangement that allowed recordkeeping fees to be paid through revenue sharing. On appeal, plaintiffs propose alternative recordkeeping arrangements they would have preferred. For example, plaintiffs argue Northwestern should have implemented a negotiated total fee based on a flat recordkeeping fee, which could have been "allocated to participants." App. Br. at 40. But plaintiffs fail to support their claim that a flat-fee structure is required by ERISA, *see Hecker*, 556 F.3d at 585 (asset-based fees "violate[] no statute or regulation"), or would even benefit plan participants. Indeed, such a structure may have the opposite effect of increasing administrative costs by failing to match the pro-rata fee that individual participants

could achieve at a lower cost through exercising their investment options in a revenue-sharing structure.[9] Either way, this court has recognized that although total recordkeeping fees must be known to participants, they need not be individually allocated or based on any specific fee structure. *See Hecker*, 556 F.3d at 586 (finding so long as participants knew "the total fees for the funds, … [t]his was enough").

In their amended complaint, plaintiffs alleged that Northwestern should have solicited competitive bids for a fixed per-capita fee ($35 per year per participant) by a single recordkeeper instead of using two separate recordkeepers, TIAA and Fidelity. According to plaintiffs, multiple recordkeeping arrangements impose higher costs on plan participants. Northwestern, though, explained it was prudent to have this arrangement so it could continue offering the Traditional Annuity among its offerings. If Northwestern removed TIAA and hired a third-party recordkeeper, participants would have lost access to the Traditional Annuity and any funds invested in the annuity would have been subject to the 2.5% surrender charge. We disagree with plaintiffs' theory that Northwestern was required to seek a sole recordkeeper to satisfy its fiduciary duties, finding Northwestern's decision to maintain two recordkeepers prudent.

To the extent plaintiffs alleged Northwestern should have selected TIAA as its sole recordkeeper, that assertion also fails

---

[9] *See* Amicus Br. for the U.S. Chamber of Commerce in Supp. of Appellees at 9, ECF No. 42 (describing "revenue sharing" as "a common practice in which service providers of mutual funds share a percentage of the fees they receive with the administrative-service provider of a particular plan … which can help defray participants' recordkeeping and other administrative costs").

to state a claim for relief. Plaintiffs' amended complaint contains no allegation that plan participants would have been better off with TIAA as the sole recordkeeper. The complaint does not include Fidelity's recordkeeping costs, and it fails to allege that those costs are the reason for higher fees. Regardless, ERISA does not require a sole recordkeeper or mandate any specific recordkeeping arrangement at all. *See Renfro*, 671 F.3d at 319 (upholding as prudent plans that used multiple recordkeepers). Plaintiffs' suggestion (both in their amended complaint and now on appeal) to the contrary is undercut by this court's decisions in *Loomis* and *Hecker*.

In *Loomis*, this court rejected the argument plaintiffs now advance that a flat-fee recordkeeping rate is always prudent. *See Loomis*, 658 F.3d at 672–73 ("A flat-fee structure might be beneficial for participants with the largest balances," but for participants with smaller balances, it "could work out to more, per dollar under management."). Again, plaintiffs' allegations seem to rely on their disapproval of TIAA's role as recordkeeper rather than any imprudent conduct by Northwestern. But, according to plaintiffs' own allegations, Northwestern had "valid reasons" for the recordkeeping arrangements they chose, undermining plaintiffs' imprudent fiduciary claims.

Likewise, in *Hecker*, a revenue sharing arrangement that paid plan expenses did not constitute an ERISA violation. *Hecker*, 556 F.3d at 585. This court explained:

> Fidelity Trust … recovered its costs from the [plan] participants in the same way as it did from outside participants—that is, Fidelity Research would assess asset-based fees against the

various mutual funds, and then transfer some of the money it collected to Fidelity Trust.

The [plaintiffs'] case depends on the proposition that there is something wrong, for ERISA purposes, in that arrangement. The district court found, to the contrary, that such an arrangement … violates no statute or regulation. We agree with the district court. … [T]he participants were free to direct their dollars to lower-cost funds if that was what they wished to do.

*Hecker*, 556 F.3d at 585 (affirming dismissal of claims). There is, then, nothing wrong—for ERISA purposes—with plan participants paying recordkeeper costs through expense ratios. Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked. *See id.* at 586 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."). Plaintiffs have identified no alternative recordkeeper that would have accepted such a low fee or any fee lower than what was paid to Fidelity and TIAA. And plaintiffs have failed to explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interests of the plans' participants.[10] We find no ERISA violation with Northwestern's recordkeeping arrangement.

---

[10] At any rate, plan participants had options to keep the expense ratios (and, therefore, recordkeeping expenses) low. The amount of fees paid were within the participants' control because they could choose which funds to invest the money in their account. *See Divane*, 2018 WL 2388118 at *10. Participants could invest in various low-cost index funds with expense ratios ranging between .05% and .1%: Fidelity 500 Index (Inst)

**3**

Plaintiffs further alleged Northwestern breached its fiduciary duties by providing investment options that were too numerous, too expensive, or underperforming. As alleged, some of these options were retail funds with retails fees, some had "unnecessary" layers of fees, and some could have been cheaper but Northwestern failed to negotiate better fees. Am. Compl. ¶¶ 264–66. Plaintiffs also spill much ink in their amended complaint describing their clear preference for low-cost index funds. We understand their preference and acknowledge the industry may be trending in favor of these types of offerings. Am. Compl. ¶¶ 188–205. Plaintiffs failed to allege, though, that Northwestern did not make their preferred offerings available to them. In fact, Northwestern did. Plaintiffs simply object that numerous additional funds were offered as well. But the types of funds plaintiffs wanted (low-cost index funds) "*were and are* available to them," *Divane*, 2018 WL 2388118 at *8, eliminating any claim that plan participants were forced to stomach an unappetizing menu.

---

(FXSIX) at an expense ratio of .05%; TIAA-CREF S&P 500 Index at .06%; Fidelity Spartan 500 Index at .1%; Fidelity 500 Index at .1%; Fidelity International Index at .1%; Fidelity Total Market Index at .1%; Vanguard Small Cap Index at .1%. *Id.* at *8. Am. Compl. ¶¶ 161, 176. Based on plaintiffs' allegations regarding the number of plan participants and the individual fees paid, average expense ratios for the plans ranged between .125% to .2% (for the Voluntary Savings Plan) and between .14% and .197% (for the Retirement Plan), with average recordkeeping costs lower than these ranges. *See id.* at *10. App. Br. at p. 33. The available investment options, then, reflect expense ratios that are low, *id.* at *8, and fees that "are reasonable as a matter of law." *Id*. at *10.

Regarding retail fees, plaintiffs invoke the Eighth Circuit's decision in *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), as applied by this court in *Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016), to suggest a blanket prohibition on retail share classes. But *Allen* cited *Braden* only to support its analysis of the pleading burden for prohibited transaction claims under ERISA, *see Allen*, 835 F.3d at 676, 678, not to question the prudence of offering retail share class funds. Moreover, *Braden* is distinguishable on its facts. There, the court found imprudence because the investment plan included a "relatively limited menu of funds"—ten—which "were chosen to benefit the trustee at the expense of the participants." *Braden*, 588 F.3d at 596; *see Loomis*, 658 F.3d at 671 (distinguishing *Braden* on that basis). The plans here offered hundreds of options—over 400 combined—making a claim of imprudence less plausible. *See Braden*, 588 F.3d at 596 n.6.

Similarly, plaintiffs rely on the Third Circuit's holding in *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019), to find "a meaningful mix and range of investment options [does not] insulate[] plan fiduciaries from liability for breach of fiduciary duty." 923 F.3d at 330. But despite plaintiffs' contention to the contrary, the court did not disregard the mix of offered investment options. Rather, the court in *Sweda* declined to find a "bright-line rule that providing a range of investment options satisfies a fiduciary's duty" because "[p]ractices change over time, and bright-line rules would hinder courts' evaluation of fiduciaries' performance against contemporary industry practices." *Id.* (internal quotations omitted). The court determined it need not look only at the available range of offerings but would consider that range in the context of the fiduciary's overall performance. The court reiterated that "ERISA fiduciaries have a duty to act prudently according to current

practices," and that any "breach claim must be examined against the backdrop of the mix and range of available investment options." *Id.* The Third Circuit's approach is sound and not inconsistent with our own.

We concluded in *Hecker* and *Loomis* that plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty. *Loomis*, 658 F.3d at 673–74; *Hecker*, 556 F.3d at 586 (no breach of fiduciary duty where 401(k) plan participants could choose to invest in 26 investment options and more than 2,500 mutual funds through a brokerage window). Concerning the plans' alleged underperformance, this court has determined "the ultimate outcome of an investment is not proof of imprudence." *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 465 (7th Cir. 1990); *see also Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) ("Investment losses are not proof that [a fiduciary] violated his duty of care."). We see both principles at play in this case. Not only did Northwestern provide the plans with a wide range of investment options, it also provided prudent explanations for the challenged fiduciary decisions involving alleged losses or underperformance. Plaintiffs pleaded the same prudent reasons in their amended complaint. We echo the district court in concluding that such allegations do not add up to a breach of fiduciary duty.

**4**

In their amended complaint, plaintiffs also attempted to repackage their imprudent fiduciary claims as prohibited transactions claims. They relied largely on the same facts and allegations and provided no independent argument showing those facts or allegations reveal impermissible transactions. Plaintiffs merely assert that each allegedly unreasonable fee

collected from plan participants for recordkeeping costs constituted a prohibited transaction under ERISA, 29 U.S.C. § 1106(a)(1)(D).

Under § 1106(a)(1)(D), a fiduciary is prohibited from engaging in a transaction he knows or should know "constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." Here, plaintiffs failed to plausibly allege the basic elements of their claim; namely, that any defendant benefited from the collected fees, that the fees were assets of the plans, or that any defendant knew or should have known that collecting routine fees may violate ERISA. In fact, this court has held that after a fee is collected by a recordkeeper, the amount of those fees becomes the property of the fund such that the transfer of some of it for recordkeeping costs is not a transfer of plan assets. *See Hecker*, 556 F.3d at 584 ("Once the fees are collected from the mutual fund's assets and transferred to [the recordkeeper], they become [the recordkeeper's] assets—again, not assets of the Plans")). Ignoring their pleading burden, plaintiffs concluded that dismissal of their claims on this ground should be reversed for the same reasons they argued the above claims should be reversed. For the same reasons we discussed above on the fiduciary duty claims, plaintiffs have failed to state a prohibited transaction claim.

***

Construing the facts and allegations in plaintiffs' favor, the amended complaint fails to plausibly allege a breach of fiduciary duty under ERISA. Taken as a whole, the amended complaint appears to reflect plaintiffs' own opinions on ERISA and the investment strategy they believe is appropriate for people without specialized knowledge in stocks or mutual

funds. Ultimately, defendants "cannot be faulted for" leaving "choice to the people who have the most interest in the outcome." *Loomis*, 658 F.3d at 673–74.

**B**

We consider now the district court's denial of plaintiffs' request to file a second amended complaint. This court reviews a denial of a motion for leave to amend a complaint for abuse of discretion. *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009). "[D]istrict courts have broad discretion to deny leave to amend where there is undue delay, … undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). "A new claim is futile if it would not withstand a motion to dismiss." *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001).

In their proposed second amended complaint, plaintiffs sought to add four new claims, three regarding breach of fiduciary duty generally and one regarding prohibited transactions. The district court denied plaintiffs' request for leave to file the second amended complaint for two reasons: plaintiffs unduly delayed bringing the claims, and the four proposed counts failed to state claims for relief and did not state new or additional claims. We agree.

Plaintiffs did not even attempt in their brief to explain the undue delay. Instead, plaintiffs note they were "separat[ing] out" the claims that had previously been included in the amended complaint as Count V. And, as further evidenced by plaintiffs' desire to separate out their underlying claims, none of the four new claims advance arguments that were unavailable to plaintiffs at the time they asked the court for leave to

file their second amended complaint. Although plaintiffs dress up the claims with different language in the second amended complaint, they rely on the same allegations and facts, revealing these claims as essentially the same claims separated into different counts. Because they are essentially the same claims, they too suffer from a lack of proper pleading.

## C

Finally, we consider the district court's decision to reject plaintiffs' jury demand. This court reviews de novo the determination that no right to a jury trial exists. *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004).

Although we need not reach the district court's decision here because we affirm dismissal, it is worth noting the court's general position on this point. The Supreme Court has held there is no right to a jury trial on this type of claim. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011) ("[A] suit by a beneficiary against a plan fiduciary (whom ERISA typically treats as a trustee) … is the kind of lawsuit that, before the merger of law and equity, [plaintiffs] could have brought only in a court of equity, not a court of law."). This court has held the same: "The general rule in ERISA cases is that there is no right to a jury trial because ERISA's antecedents are equitable, not legal." *McDougall*, 494 F.3d at 576 (quoting *Mathews*, 144 F.3d at 468); *see also Patton*, 480 F.3d at 484 (recognizing the "general rule in ERISA cases, where the plaintiff has no right to a jury trial"). Because this case involves a suit against a fiduciary for breach of trust, the traditional equitable remedy is surcharge (the requirement to make the beneficiary whole for any losses caused by the breach), not a legal remedy. *See CIGNA*, 563 U.S.

at 440–43. We follow binding precedent and conclude no right to a jury trial exists in this ERISA case.

## IV

For the reasons above, we AFFIRM the district court's dismissal of plaintiffs' amended complaint on all counts and AFFIRM the decision to deny plaintiffs' request for leave to further amend the complaint and for a jury trial.